IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MORIDIA CAMACHO ACOSTA,
et al.,

    Plaintiffs,

    v.                                      CIVIL NO. 07-1109 (RLA)

HARBOR HOLDINGS & OPERATIONS,
INC., et al.,

    Defendants.

## ORDER IN THE MATTER OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants have moved the court to enter summary judgment on their behalf and to dismiss the instant complaint. The court having reviewed the arguments presented by the parties in their respective memoranda as well as the extensive documentation submitted therewith hereby disposes of defendants' request as follows.

Plaintiff MORIDIA CAMACHO ACOSTA[1] instituted these proceedings claiming sexual harassment, gender discrimination and retaliation pursuant to the provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e(3) and § 2000e(5) as well as various local discrimination provisions.[2]

---

[1] Plaintiff's husband, JOSE A. VELEZ DUVERGE, also seeks relief based on local tort provisions.

[2] Puerto Rico Act No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29, §§ 146 et seq. (2002) (sex discrimination); Puerto Rico Act No. 69 of July 6, 1985, Laws of P.R. Ann. tit. 29, §§ 1321 et seq. (2002) (retaliation); Act No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29

Relief was also petitioned under the provisions of Act No. 139 of June 26, 1968, P.R. Laws Ann. tit. 11, §§ 201 et seq. (2007) ("Temporary Disability Benefit Act").

Plaintiff further claims unjust termination pursuant to Act 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a-185k (2002) ("Law 80") and breach of contract. The complaint also asserts tort claims under arts. 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-5142 (2002).

Named defendants are: HARBOR HOLDINGS & OPERATIONS, INC. ("HH&O"), SAN JUAN BAY PILOTS ("SJBP"), STEPHEN RIVERA, CESAR A. MONTES, JOSEPH ESTRELLA, DANIEL MURPHY, EMIL DIAZ, ROBERTO CANDELARIO and FULGENCIO ANAVITATE.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the

§ 155 (2002) (Law 17) (sexual harassment); Act No. 3 of March 13, 1942, P.R. Laws Ann. tit. 29, § 469 (2002) (pregnancy discrimination).

absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)). "In marshaling the facts for this purpose we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (internal citation omitted, italics in original).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments"); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment"); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477

U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2001); <u>Grant's Dairy v. Comm'r of Maine Dep't of Agric.</u>, 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st Cir. 2000); <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

Any testimony used in support of discriminatory motive in a motion for summary judgment setting must be admissible in evidence, i.e., based on personal knowledge and otherwise not contravening evidentiary principles. Rule 56(e) specifically mandates that affidavits submitted in conjunction with the summary judgment mechanism must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." <u>Hoffman v. Applicators Sales and Serv., Inc.</u>, 439 F.3d 9, 16 (1st Cir. 2006); <u>Nieves-Luciano v. Hernandez-Torres</u>, 397 F.3d 1, 5 (1st Cir. 2005); <u>Carmona v. Toledo</u>, 215 F.3d 124, 131 (1st Cir. 2000). *See also*, <u>Quiñones v. Buick</u>, 436 F.3d 284, 290 (1st Cir. 2006) (affidavit inadmissible given plaintiff's failure to cite "supporting evidence to which he could testify in court"). Additionally, the document "must concern facts as opposed to conclusions, assumptions, or surmise", <u>Perez v. Volvo Car Corp.</u>, 247

F.3d 303, 316 (1ˢᵗ Cir. 2001), not conclusory allegations <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d at 414.

"To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient. However, a party's own affidavit, containing relevant information of which he has firsthand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." <u>Santiago v. Centennial</u>, 217 F.3d 46, 53 (1ˢᵗ Cir. 2000) (internal citations and quotation marks omitted).

"A court is not obliged to accept as true or to deem as a disputed material fact each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party." <u>Garcia v. Bristol-Myers Squibb Co.</u>, 535 F.3d 23, 31 n.5 (1ˢᵗ Cir. 2008) (internal citation, brackets and quotation marks omitted).

## II. FACTUAL BACKGROUND

Plaintiff was hired by codefendant HH&O on May 3, 2001, as an accountant at the rate of $12.00 per hour. This was the rate that plaintiff requested at the time she was initially hired.

Throughout her tenure, plaintiff was the only female employee working at HH&O.

The elected President of the Board of Directors acts as Chief of Personnel of all HH&O's employees.

Codefendant STEPHEN RIVERA, then President of the Board of Directors of HH&O, interviewed and hired plaintiff.

Codefendant HH&O is a corporation created to operate, manage, develop and administer the facilities, services and any other matters related to the services rendered by the harbor pilots in San Juan, Puerto Rico.

Codefendant SJBP is a duly organized corporation that groups the harbor pilots serving the port of San Juan, Puerto Rico as the only pilots' association recognized by the Pilotage Commission for the San Juan Harbor.

The individual harbor pilots are independent contractors who provide their services to SJBP. The SJBP does not have any employees on its payroll.

The harbor pilots are the individuals responsible for bringing in ships into the San Juan bay. They divide their work shifts in two-week periods. They work for two weeks and are off duty the following two weeks. Thus, their period of service within a year is approximately 26 weeks, excluding vacation time. The harbor pilots are not required to be present at the offices of HH&O when on duty.

During her deposition, plaintiff described her duties as an accountant for HH&O as follows: in charge of completing the entire accounting cycle (i.e., income tax returns, bank reconciliations, general ledger, budget), accounts payable, debt collection and payment to the harbor pilots for services rendered.

Plaintiff further noted that codefendant EMIL DIAZ was in charge of accounts receivable, accounts payable, billing agencies, collection agencies, employee payroll and billing small vessels.

On September 28, 2001, plaintiff was notified of a salary increase from HH&O effective October 1, 2001. The compensation package also included fringe benefits such as medical insurance, life insurance, reimbursement of $500.00 in medical deductibles and $275.00 for an annual medical exam.

Via a letter dated October 10, 2002, codefendant ROBERTO CANDELARIO, then President of the Board of Directors, notified plaintiff of a 7% salary increase. In 2002 plaintiff continued to enjoy the same fringe benefits. Further, once she had worked a full year as a permanent employee plaintiff was also added to the 401k plan.

On October 3, 2005, plaintiff filed a Charge of Discrimination with the Anti-Discrimination Unit of the Puerto Rico Department of Labor ("PR-DOL") claiming gender discrimination and sexual harassment.

On October 19, 2005, plaintiff filed a second Charge of Discrimination with the Anti-Discrimination Unit of the PR-DOL alleging gender discrimination and retaliation.

Plaintiff did not identify or name SJBP as her employer in any of her discrimination charges.

On November 14, 2005 plaintiff left work before the end of her shift and filed a criminal complaint in the local police station charging MONTES with breach of peace.

According to the police records, this complaint was dismissed due to lack of interest. Plaintiff alleges that she was unaware that the complaint had been dismissed by the police.

The following day, on November 15, 2005, plaintiff reported for treatment at the Puerto Rico State Insurance Fund ("SIF").

Plaintiff never returned to work after November 14, 2005. She never resigned from her employment either verbally or in writing even after being released from treatment by the SIF in May 2006.

In 2006 HH&O hired MARI TERE RIVERA as an Accountant, initially on a temporary basis. She was subsequently employed on a permanent basis when plaintiff did not return to her job after being discharged from treatment by the SIF.

### III. TITLE VII - SEXUAL HARASSMENT

### A. The Law

The protection against discrimination in employment based on sex provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) has been expanded to areas beyond strictly "economic" and "tangible discrimination" to situations where "sexual harassment is so severe or pervasive as to alter the condition of the victim's employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 2283, 141

CIVIL NO. 07-1109 (RLA)                                          Page 10

L.Ed.2d 662, 675 (1998) (citations, internal quotation marks and brackets omitted); Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49, 60 (1986); Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

Ascertaining which particular conduct falls within the "severe or pervasive" realm in order to trigger Title VII protection is no easy task.  However, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Billings, 515 F.3d at 47; Noviello, 398 F.3d at 92. The court will examine the totality of the circumstances to determine whether the degree of the hostile or abusive environment the employee is subjected to is intense enough to fit within Title VII protection. Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Noviello, 398 F.3d at 92; Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 46 (1st Cir. 2003); Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir.  2003).

> [W]hether the environment is objectively hostile or abusive
> must be answered by reference to all the circumstances,
> including the frequency of the discriminatory conduct;  its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (internal citations omitted); Noviello, 398 F.3d at 92; Lee-Crespo, 354 F.3d at 46; Che, 342 F.3d at 40; Gorski v. New Hampshire Dep't of Corrections, 290 F.3d 466, 472 (1st Cir. 2002); Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

The First Circuit Court of Appeals summarized the elements plaintiff must prove in order to succeed in her hostile work environment claim as set forth by the Supreme Court.  These are:

(1) that she... is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and

the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. O'Rourke, 235 F.3d at 728.

A hostile work environment may result from "sexual remarks, innuendoes, ridicule and intimidation ... disgusting comments" Goya, 304 F.3d at 19 (citations and internal quotations omitted) "unwelcome sexual advances or demands for sexual favors" Gorski, 290 F.3d at 472 (citations and internal quotations omitted) which are "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." O'Rourke, 235 F.3d at 728 (citations and quotation marks omitted). *See also*, Noviello, 398 F.3d at 84.

"The point at which a work environment becomes hostile or abusive does not depend on any mathematically precise test. Instead the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances. These circumstances may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance, but are by no means limited to them, and no single factor is required." Billings, 515 F.3d at 48 (internal citations and quotation marks omitted).

Courts must discern between "commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness... and severe or pervasive harassment... [and] [t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id* at 92. *See also*, Lee-Crespo, 354 F.3d at 37 (supervisor's conduct found "boorish and unprofessional" and plaintiff "subjected to incivility" "but... incidents... not severe or pervasive enough to alter the terms and conditions of [plaintiff's] employment").

"No particular 'types of behavior' are essential to a hostile environment claim." Billings, 515 F.3d at 48."[T]he hostility vel non of a workplace does not depend on any particular kind of conduct; indeed, a worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed." Billings, 515 F.3d at 48 (internal citations, quotation marks and brackets omitted).

It is plaintiff's burden to establish the severity and pervasiveness of the harassment sufficient to alter the conditions of her employment. Conto, 265 F.3d at 82. In this particular case plaintiff must also present evidence that the harassment was based on plaintiff's gender. Lee-Crespo, 354 F.3d at 44 n.6.

Because this determination is "fact specific" Conto, 265 F.3d at 81, ordinarily "it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable

person would have felt that it affected the conditions of her employment." Goya, 304 F.3d at 19. *See also*, Che, 342 F.3d at 40 ("[a]s a general matter, these are questions best left for the jury.")

### B. The Facts

According to plaintiff, the following three incidents involving ESTRELLA constitute her **only** claims of purported sexual harassment while employed with HH&O.[3]

On **September 2, 2005** and on **September 6, 2005**, ESTRELLA told plaintiff that if she deposited funds on that day he would kiss her and on **September 13, 2005**, ESTRELLA told her she looked tired and offered to give a rub with Ben Gay ointment. Plaintiff testified in her deposition that these three incidents - which took place in September 2005 - were the only comments or acts which she deemed sexual harassment on his part.

Plaintiff alleges that apart from rejecting these advances and avoiding ESTRELLA, she brought them to the attention of EMIL DIAZ who failed to take any corrective action. DIAZ denies having received any such complaints.

ESTRELLA rejected any discriminatory connotation to his remarks explaining that it was their custom to greet each other with a kiss on the cheek when he met plaintiff and that he used the phrase "If

---

[3] See Opposition to Motion for Summary Judgment (docket No. 42) pp. 9-10, ¶¶ 23-25.

**CIVIL NO. 07-1109 (RLA)**                                      **Page 15**

you are hurting, a little Ben Gay will take the pain away" with
everyone at the office.

Even assuming ESTRELLA's remarks were impregnated with the
sexual connotation proffered by plaintiff, we find that these three
isolated incidents, albeit undesirable in a work setting, do not meet
the severity and pervasiveness required by law. In other words, these
three comments are legally insufficient to alter plaintiff's
conditions of employment necessary to meet the hostile environment
requirements.

Based on the foregoing, plaintiff's Title VII sexual harassment
claim is **DISMISSED.**

### IV. CONSTRUCTIVE DISCHARGE

As the term unequivocally connotes, the *sine qua non* requirement
for a constructive discharge claim is that a plaintiff is compelled
to leave his or her employment.

> [T]he purpose of the constructive discharge doctrine [is]
> to protect employees from conditions so unreasonably harsh
> that a reasonable person would feel compelled to leave the
> job. The doctrine reflects the sensible judgment that
> employers charged with employment discrimination ought to
> be accountable for creating working conditions that are so
> intolerable to a reasonable employee as to compel that
> person to resign.

CIVIL NO. 07-1109 (RLA)                                    Page 16

Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732 (1st Cir. 1999). *See also*, Feliciano-Hill v. Principi, 439 F.3d 18, 27 (1st Cir. 2006); Vieques Air Link, Inc. v. U.S. Dep't of Labor, 437 F.3d 102, 108 (1st Cir. 2006).

In order to establish a claim based on constructive discharge "plaintiff must prove that his employer imposed working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 613 (1st Cir. 2000) (citations and internal quotations omitted); Jorge v. Rumsfeld, 404 F.3d 556, 562 (1st Cir. 2005); Simas v. First Citizen's Fed. Credit Union, 170 F.3d 37, 46 (1st Cir. 1999); Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 26 (1st Cir. 1997). *See also*, Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001) ("treatment so hostile or degrading that no reasonable employee would tolerate continuing in the position").

The "subjective perceptions" of the employee are insufficient. The reasonableness of plaintiff's decision to leave his employment is an objective one and will be examined based on the ability to "present sufficient evidence to allow the jury to credit his claim that a reasonable employee would have felt compelled to resign under the circumstances," Ramos v. Davis & Geck, Inc., 167 F.3d at 731 and "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." Marrero v. Goya of P.R., Inc., 304 F.3d

CIVIL NO. 07-1109 (RLA)                                      Page 17

at 28. *See also*, <u>Feliciano-Hill</u>, 439 F.3d at 27 and <u>Serrano-Cruz</u>, 109 F.3d at 26 (applying "objective standard" in examining employer's actions).

Plaintiff is not required to present "proof that the employer created the intolerable work conditions with the specific intent of forcing the employee to resign." <u>Ramos v. Davis & Geck, Inc.</u>, 167 F.3d at 732.

The court is faced with the difficult task of sorting through the considerable number of proposed uncontested facts submitted by plaintiff in an attempt to get them to fit within the myriad claims asserted by her. Even though both parties have addressed the constructive discharge theory of relief in their respective memoranda, no reference to any particular statute has been proffered to support this particular cause of action. Thus, we shall assume that the constructive discharge claim was a culmination of the allegedly discriminatory harassment asserted under Title VII.

Constructive discharge that results from sexual harassment or a hostile work environment is actionable under Title VII. <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). The Supreme Court has indicated that the hostile work environment claim is a "lesser included component" of "the *graver* claim of hostile-environment constructive discharge". *Id*. at 149 (italics in original). In other words, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment

constructive discharge case... [T]he only variation between the two claims is the severity of the hostile working conditions." *Id.*

According to plaintiff, she was subjected to working conditions so intolerable that she felt compelled to forsake her job. In her memorandum, plaintiff claims that prevailing atmosphere during her last months at work was permeated with constant harassment which forced her to leave work.

However, because we have dismissed plaintiff's underlying sexual harassment claim we need not pursue arguments regarding alleged harassment culminating in discharge.

Accordingly, plaintiff's constructive discharge claim is hereby **DISMISSED.**

### V. GENDER BASED DISCRIMINATION - WORKING CONDITIONS AND PAY

Plaintiff further alleges gender based discrimination due to changes to her work schedule, salary increases and fringe benefits as well as difference in pay.

### A. Burden of Proof

Art. 703 of Title VII of the 1964 Civil Rights Act, as amended, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... [sex]... or national origin". 42 U.S.C. § 2000e-2(a)(1).

In cases where direct evidence of discrimination is not available, claims alleging denial of "equal terms and conditions of

employment because of [gender]" are subject to the *McDonnel Douglas* burden shifting framework. <u>Kosereis v. Rhode Is.</u>, 331 F.3d 207, 212 (1st Cir. 2003). *See also*, <u>Rodriguez v. Smithkline Beecham</u>, 224 F.3d 1, 8 (1st Cir. 2000) (absent direct evidence of discrimination, plaintiff must follow the *McDonnell Douglas* burden-shifting framework by presenting evidence sufficient to constitute a prima facie case of wage discrimination).

In order to meet her initial burden in this action, plaintiff must "show[] by a preponderance of the evidence that she has a job similar to that of higher paid males. Once that prong is established, the defendant must merely provide a non-discriminatory reason for the disparity. The third stop in the evidentiary structure is that the plaintiff must demonstrate by a preponderance of the evidence that the employer's reason is a pretext for unlawful discrimination." <u>Rodriguez v. Smithkline Beecham</u>, 62 F.Supp.2d 374, 383 (D.P.R. 1999), *aff'd*, 224 F.3d 1 (internal citations omitted).

Even though they may, in disparate treatment cases plaintiffs are not required to show that they were treated differently than non-members as part of their prima facie case. "'[T]he time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employers' articulated reason for having acted adversely to the plaintiff's interest.'" <u>Kosereis</u>, 331 F.3d at

213 (citing <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 19 (1st Cir. 1999); <u>Garcia</u>, 535 F.3d at 31.

"A plaintiff can demonstrate that an employer's stated reasons are pretextual in any number of ways, including by producing evidence that plaintiff was treated differently from similarly situated employees. To successfully allege disparate treatment, a plaintiff must show that others similarly situated to her in all relevant respects were treated differently by the employer. The comparison cases need not be perfect replicas, but they must closely resemble one another in respect to relevant facts and circumstances." <u>Garcia</u>, 535 F.3d at 31 (internal citations, brackets and quotation marks omitted). *See* <u>Rivera Aponte v. Restaurant Metropol #3, Inc.</u>, 338 F.3d 9, 12 (1st Cir. 2003) ("[A] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects") (quotation omitted). *See also*, <u>Rivera-Rodriguez v. Frito Lay</u>, 265 F.3d 15, 25 (1st Cir. 2001); <u>Rivas v. Radio Shack, Inc.</u>, 312 F.3d 532, 534 (1st Cir. 2002); <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 21 (1st Cir. 1999).

In examining the matters at issue we must bear in mind that "whether or not personal or professional hostility played a role in the assessment, federal law does not protect generally against arbitrary or unfair treatment in private employment, but only against actions motivated by listed prejudices such as race, age and gender.

CIVIL NO. 07-1109 (RLA)                                              **Page 21**

Discrimination is a form of unfairness; but not all unfairness is discrimination." <u>Sabinson v. Trustees of Dartmouth Coll.</u>, 542 F.3d 1, 4 (1st Cir. 2008).

### B. Work Schedule

Plaintiff claims that changes in her work schedule were discriminatory. When plaintiff was initially hired, her working hours were from 6:30 a.m. to 3:30 p.m. Effective February 8, 2004, the Accounting Department hours were changed to commence at 7:00 a.m. until 4:00 p.m. in order to provide better service to the shipping agencies. Effective February 28, 2005, the work shifts for both plaintiff and IVAL GUTIERREZ were changed again to commence at 8:00 a.m. until 5:00 p.m.

Based on the foregoing, we find this allegation without merit. Plaintiff has failed to establish that she was treated differently from her male counterparts. The changes at issue equally affected male employees and no evidence of pretext has been found.[4]

Accordingly, the gender discrimination claim based on plaintiff's work schedule is **DISMISSED.**

### C. Salary Revisions and Fringe Benefits

We find that plaintiff's salary revisions and Christmas bonuses were not discriminatory based on her gender. Plaintiff's salary was never reduced nor was she ever demoted. She continued to have the

---

[4]   Additionally, effective February 10, 2003, the work schedule in the Mechanics Department was also changed to commence at 7:00 a.m. until 4:00 p.m.

CIVIL NO. 07-1109 (RLA)                                          **Page 22**

same benefits while employed. She received salary increases in 2001, 2002, and 2005. It is undisputed that in 2003 and 2004 no employee received a salary increase.

Plaintiff argues that in 2002 her salary was increased by only 7%. However, as pointed out by defendants, when compared to the male employees plaintiff did no worse than them. That year another male employee received the same increase percentage while another three received 5% and one only 3%.

Plaintiff also contends that in 2005 her pay increase was only 9 cents. However, the amounts awarded as salary increases for that year overall were minor. Further, plaintiff had two warnings in her record at the time.

Lastly, during her tenure plaintiff always received a Christmas bonus which was higher than the amounts received by the vast majority of the male employees.

Accordingly, plaintiff's gender discrimination claim based on salary revisions and benefits is **DISMISSED**.

### D. Difference in Pay

Plaintiff contends that when she was hired RIVERA promised that her salary would be $18.00 per hour, plus a $500.00 monthly car allowance and payment of accounting fees for small ships of SJBP.

According to plaintiff, she felt discriminated based on gender because she was not given the salary and benefits she had been promised by RIVERA. According to plaintiff she was advised by STEPHEN

RIVERA that she would be carrying out all duties previously performed by RUBEN JIMENEZ, her predecessor, and that upon becoming a permanent employee she would be receiving his same salary and fringe benefits.

Additionally, RUBEN JIMENEZ was paid a monthly fee for the small vessels which she was also promised. Plaintiff was assigned the accounting for the small vessels. However, she contends that she was paid for this service only once in 2002 after becoming a permanent employee.[5] Payment was discontinued purportedly upon STEPHEN RIVERA's objection who alleged that EMIL DIAZ was the only person in charge of small vessels.

We find that plaintiff has met her prima facie burden to establish wage disparity. She was a female and was paid less than her predecessor while occupying the same position. Other than denying any such promises were made and arguing that the purported agreement was a misunderstanding on plaintiff's part, defendants have not proffered any non-discriminatory reasons to account for the difference in pay.

Accordingly, we **DENY** defendants' request to dismiss plaintiff's claim based on a discriminatory pay scale with respect to her predecessor.[6]

_____

[5] See Letter from CANDELARIO dated July 31, 2002, notifying plaintiff that commencing on the third trimester of 2002, upon having concluded her probationary one year period, she would be paid 5% of the total small vessels' revenue for her accounting services to the SJBP.

[6] This claim is separate from any breach of contract cause of action plaintiff may have pled.

## VI. RETALIATION - THE LAW

"Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because 'he has opposed any practice made an unlawful employment practice..., or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing.'" DeClaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008).

The interests sought to be protected by Title VII's anti-discrimination mandate differ from those underlying its retaliation clause. "The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). "It therefore does not matter for retaliation purposes whether [the employer] would have treated a male [employee] the same way he treated [plaintiff]. The relevant question is whether [the employer] was retaliating against [plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time." DeClaire, 530 F.3d at 19.

Hence, for retaliation purposes "[t]he relevant conduct is that which occurred *after* [plaintiff] complained about his superior's [discriminatory] related harassment." Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006).

CIVIL NO. 07-1109 (RLA)                                        Page 25

## A. Burden of Proof

"The evidence of retaliation can be direct or circumstantial." DeClaire, 530 F.3d at 20. Unless direct evidence is available, Title VII retaliation claims may be proven by using the burden-shifting framework set forth  down in McDonnell Douglas. "In order to establish a prima facie case of retaliation, a plaintiff must establish three elements. First, the plaintiff must show that he engaged in a protected activity. Second, the plaintiff must demonstrate he suffered a materially adverse action, which caused him harm, either inside or outside of the workplace. The impact of this harm must be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. Third, the plaintiff must show that the adverse action taken against him was causally linked to his protected activity." Mariani-Colon v. Dep't of Homeland Sec. ex rel., 511 F.3d 216, 223 (1st Cir. 2007) (citations and internal quotation marks omitted); Moron-Barradas v. Dep't of Educ. of Com. of Puerto, 488 F.3d 472, 481 (1st Cir. 2007); Quiles-Quiles, 439 F.3d at 8.

"Under the *McDonnell Douglas* approach, an employee who carries her burden of coming forward with evidence establishing a prima facie case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions... If the employer's evidence creates a genuine issue of fact, the presumption of

discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for the challenged actions was in fact a pretext for retaliating." Billings v. Town of Grafton, 515 F.3d 39, 55 (1st Cir. 2008) (citations, internal quotation marks and brackets omitted).

"[A]n employee engages in protected activity, for purposes of a Title VII retaliation claim, by opposing a practice made unlawful by Title VII, or by participating in any manner in an investigation or proceeding under Title VII." Mariani-Colon, 511 F.3d at 224.

"[Title VII's] anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington, 548 U.S. at 67. In order to prevail on a retaliation claim "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. It is not necessary that the conduct at issue affect the employee's "ultimate employment decisions." Id. at 67.

According to Burlington, the determination of whether a particular action is "materially adverse" must be examined based on the facts present in each case and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 71 (citation and internal quotation marks omitted).

In reaching its decision in *Burlington*, the Supreme Court considered factors such as the fact that the duties of a position "were... more arduous and dirtier" when compared to the other position which "required more qualifications, which is an indication of prestige [] and... was objectively considered a better job". *Id.* (citation and quotation marks omitted).

In *Billings* the court distinguished between minor incidents which take place in the usual course of a work setting and have no import on an individual's decision to file a discrimination charge and those which might deter an employee from complaining of such conduct. Specifically, the court noted that "some of [the supervisor's] behavior - upbraiding [plaintiff] for her question at the Board of Selectmen meeting, criticizing her by written memoranda, and allegedly becoming aloof toward her - amounts to the kind of petty slights or minor annoyances that often take place at work and that all employees experience and that, consequently, fall outside the scope of the antidiscrimination laws... But we cannot say the same for the other incidents, namely, investigating and reprimanding [plaintiff] for opening the letter from [the supervisor's] attorney, charging her with personal time for attending her deposition in this case, and barring her from the Selectmen's Office. While these measures might not have made a dramatic impact on [plaintiff's] job, conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim. Indeed, we think that these

actions, by their nature, could well dissuade a reasonable employee from making or supporting a charge of discrimination. An employee who knows that, by doing so, she risks a formal investigation and reprimand - including a threat of further, more serious discipline - for being insufficiently careful in light of her pending litigation as well as the prospect of having to take personal time to respond to a notice of deposition issued by her employer in that litigation, might well choose not to proceed with the litigation in the first place." Billings, 515 F.3d at 54 (citations, internal quotation marks and brackets omitted).

"It is true that an employee's displeasure at a personnel action cannot, standing alone, render it materially adverse... [but plaintiff] came forward with enough objective evidence contrasting her former and current jobs to allow the jury to find a materially adverse employment action." *Id*. at 53.

Depending on the particular set of facts at hand, "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." DeClaire, 530 F.3d at 19 (citation and internal quotation marks omitted). *See also*, Mariani-Colon, 511 F.3d at 224 ("[T]he 'temporal proximity' between appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation"); Quiles-Quiles, 439 F.3d at 8 ("[I]n proper circumstances, the causation

element may be established by evidence that there was a temporal proximity between the behavior in question and the employee's complaint.")

"[T]here is no mechanical formula for finding pretext. One way to show pretext is through such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons." Billings, 515 F.3d at 55-56 (citations, internal quotation marks and brackets omitted).

Plaintiff carries the burden of presenting admissible evidence of retaliatory intent in response to a summary judgment request. The court need not consider unsupported suppositions. "While [plaintiff] engages in much speculation and conjecture, a plaintiff cannot defeat summary judgment by relying on conclusory allegations, or rank speculation. To defeat summary judgment, a plaintiff must make a colorable showing that an adverse action was taken for the purpose of retaliating against him." Mariani-Colon, 511 F.3d at 224 (citations and internal quotation marks omitted).

Additionally, even though "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination, but doing so is not required, as there

will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." DeClaire, 530 F.3d at 19-20 (italics in original).

Lastly, there are instances where issues of fact regarding the veracity of the allegedly pretextual reasons demand that trial be held to resolve them. *See i.e.*, Billings, 515 F.3d at 56 (citations and internal quotation marks omitted) ("But we think that, under the circumstances of this case, it is the jury that must make this decision, one way or another. As we have advised, where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment. Such caution is appropriate here, given the factual disputes swirling around the transfer decision.")

### B. Retaliatory Harassment

In retaliation cases, "[t]he adverse employment action may be satisfied by showing the creation of a hostile work environment or the intensification of a pre-existing hostile environment." Quiles-Quiles, 439 F.3d at 9. *See also*, Noviello, 398 F.3d at 89 ("[T]he creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action".) "[A] hostile work

environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action... This means that workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for... retaliation cases." *Id.* (under Title VII). "Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity." *Id.* at 90.

"[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." <u>Billings</u>, 515 F.3d at 54 n.13.

Proving retaliatory intent is crucial. Hence, the purpose behind the harassment must be to retaliate for the protected conduct, that is, it must be motivated by plaintiff's exercise of her statutory rights. <u>Carmona-Rivera v. Puerto Rico</u>, 464 F.3d 14, 20 (1st Cir. 2006); <u>Quiles-Quiles</u>, 439 F.3d at 9.

Causation may be established by the temporal proximity between the harassment and the protected conduct. *See, i.e.*, *id.* 439 F.3d at 9 (intensified harassment shortly after filing EEOC complaint).

Even though "[t]he existence of a hostile environment is determined by the finder of fact... that does not prevent a court from ruling that a particular set of facts cannot establish a hostile

environment as a matter of law in an appropriate case." <u>Billings</u>, 515 F.3d at 47 n.7.

### C. Retaliation - The Facts

Plaintiff's initial discrimination charge was filed on **October 3, 2005**. Accordingly, we shall examine the subsequent allegedly retaliatory events charged by plaintiff to determine whether either individually or collectively they constitute materially adverse actions necessary to establish a hostile environment.

### 1.   Inspection of personnel file and leaving early.

In a memorandum dated **October 28, 2005**, RIVERA, as President of the Board of Directors, advised plaintiff that pursuant to her October 17, 2005 written request, she could inspect her personnel file pursuant to the policy established in the Employee Handbook. In the memorandum plaintiff was also admonished for leaving her work 20 minutes early on October 18, 2005 without prior authorization from her supervisor.

Upon receipt of the memorandum, plaintiff wrote a note stating that the admonishment was in retaliation for having filed the discrimination charge.

Plaintiff has not introduced evidence of any causal connection between her complaint and this letter. Further, apart from mentioning that she had left early that day - a fact plaintiff has not disputed - we find no connotation in the memorandum which could be deemed

adverse to her. It merely constitutes a response to her request for information. Therefore, we conclude that this memorandum is not sufficient grounds for establishing a retaliation claim.

## 2. Payment to Pilots on Fridays.

On **November 10, 2005,** plaintiff was handed copy of a memorandum dated May 17, 2005, addressed to the Accounting Department with instructions that payment to pilots were to be effected every Friday. Upon its receipt, plaintiff wrote a note indicating that the memorandum had been personally handed in retaliation for having filed her discrimination charge.

Plaintiff conceded that payments to the harbor pilots for services rendered was part of her duties and that it was her responsibility to make collection efforts in order to have sufficient funds available to pay the pilots for their services every Friday. She also conceded in her deposition that most of the pilots complained because payment was not being timely made.[7]

We do not agree with plaintiff's characterization of this memorandum as a warning. There is no indication of any negative effect on her record. Nor do we attach any significance to the fact that plaintiff was handed a copy thereof in November other than to

_____

[7] Defendants submitted two letters from CANDELARIO one dated September 28, 2005, requesting reimbursement for expenses incurred due to the failure to deposit his checks on time and another one complaining of his failure to receive the November 11, 2005 check. Additionally, on November 14, 2005, DANIEL MURPHY also wrote expressing his concerns regarding non-payment during the month of November.

alert her to the existing situation that payment to harbor pilots was not being promptly made. Hence, we ascribe no retaliatory weight to this incident.

Additionally, there is ample uncontested evidence submitted by defendants which served as a basis for having sent her copy of the memorandum at that time.

### 3. Documents Regarding 40-ft. Vessel and Incident with CESAR MONTES.

On **November 14, 2005,** plaintiff was handed a letter signed by STEPHEN RIVERA instructing her to keep all invoices and documents related to a 40-feet pilot vessel in a separate file. Plaintiff wrote a note at the bottom of this communication stating that it was done in reprisal for having filed her discrimination charges. Whereupon, according to plaintiff, MONTES came over to her office door, became belligerent and violent, shouting at her and waving his hands to the point she feared for her safety. Plaintiff left early that day and filed a criminal complaint against MONTES for breach of the peace.

In his deposition MONTES explained that he initially verbally requested plaintiff to keep a separate file regarding the vessel. He further noted that the request was prompted by the need to ensure that all documents pertaining to the vessel's insurance and a loan that was being requested were easily retrievable. According to MONTES, plaintiff petitioned that his request be put in writing as per her attorney's instructions for which reason the memorandum had been prepared.

CIVIL NO. 07-1109 (RLA)                                        **Page 35**

The November 14, 2005 letter cannot be construed as a warning as plaintiff contends. It does not contain any information unfavorable to plaintiff or her performance nor can it be construed in any way as detrimental to plaintiff's employment. Rather, the request was based on established requirements of the Pilotage Commission regarding the vessel's insurance coverage as well as a loan that was being processed. Nor can we ascribe any retaliatory motive for the written instructions.

It is also difficult to attribute retaliatory motive to MONTES' alleged reaction from plaintiff's version of the events.[8] In her deposition plaintiff noted that "Captain Montes began to yell at me about it, that it was because of what I had written on the lower right-hand side [of the November 14, 2005 letter] that we were having all the problems in the company, he began to wave his hands and I felt threatened." Docket No. 40-4 Tr. 206 L. 15-17.

She further explained:

Q    [W]hen you're telling me that he went to your office and was yelling at you from the door, if at that moment that he's talking with you about your note and about the document, did he say that it's for the purpose of the loan.

---

[8] In support of her retaliatory animus behind MONTES' alleged reaction to her note, plaintiff alleges that this was defendants' first notice of her discrimination charges. However, on November 10, 2005, she had already alerted defendants of her having filed discrimination charges by writing a similar note when the May 17, 2005 memorandum was delivered.

A    No. He yelled at me.

Q    What did he say?

A    That everything that was occurring in the company was my
     fault.

Docket No. 62-2 Tr. 28 L. 2-10.

Lastly, we find that this incident by itself does not meet the adverse requirement necessary for a retaliatory claim.

Based on the foregoing, plaintiff's claim for retaliation under Title VII is **DISMISSED.**

### VII. JOINT EMPLOYERS

### A. The Law

Plaintiff contends that both HH&O and SJBP, as joint employers, share liability for the discrimination claims asserted herein. Accordingly, we must initially ascertain who plaintiff's employer was for purposes of Title VII.

In order to establish liability under Title VII, plaintiff must present sufficient evidence to show that the discriminatory conduct at issue can be attributable to her employer. "Title VII liability attaches only in the event of a covered employment relationship." Medina v. Adecco, 561 F.Supp.2d 162, 176 (D.P.R. 2008). The statute defines an "employer" as an individual or firm that "is engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a

person...." 42 U.S.C. § 2000e(b). *See also* De Jesus v. LTT Card Serv., 474 F.3d 16 (1st Cir. 2007) (discussing factors for determining who qualifies as an "employer" under Title VII).

The "joint employer" doctrine seeks to hold an entity liable to an employee of another entity if the evidence shows that it sufficiently had power over the employee in question.

"A joint employer relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment." Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 163 (1st Cir. 1995) (quoting Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 302, 306 (1st Cir. 1993). "In order to qualify as an employer (or joint employer) for Title VII purposes, an entity must exercise significant control over the terms and conditions of an individual's employment." Medina, 561 F.Supp.2d at 177.

"The joint employer inquiry is a matter of determining which of two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers." Rivas v. Fed. de Asoc. Pecuarias de P.R., 929 F.2d 814, 820 (1st Cir. 1991) (citation and internal quotation marks omitted).

"[T]he 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those conditions of employment." Rivas, 929 F.2d at 820 n.17 (italics in original).

In order to ascertain if indeed a joint employment condition is present, the court must examine "factors which include: supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignment; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime; and authority over the number of employees." Rivera-Vega, 70 F.3d at 163; Rivas, 929 F.2d at 820. *See also* Holyoke, 11 F.3d at 306 ("right to approve employees, control number of employees, remove an employee, inspect and approve work, and pass on changes in pay and overtime allowed"); Torres-Negron v. Merck & Company, Inc., 488 F.3d 34, 42 (1st Cir. 2007) (listing applicable factors to determine when "two or more entities are a single employer under the integrated-enterprise test").

In Holyoke, 11 F.3d at 307, the court upheld a joint employer finding based on the entity's "joint control of the... employees by, *inter alia*, its unfettered power to reject any person referred to it by [the employer] and its substantial control over the day-to-day activities of the referred employees." *See i.e.*, Virgo v. Rivera Beach Assoc., Ltd., 30 F.3d 1350, 1361 (11th Cir. 1994) ("[A]ctual control is a factor to be considered when deciding the 'joint employer' issue, but the authority or power to control is also highly relevant"); Medina, 561 F.Supp.2d at 177 ("The extent of

[codefendant's] control over [plaintiff] determines the outcome of the joint employer inquiry.")

"A 'joint employer' relationship is different from, though sometimes confused with, a 'single employer' situation." Virgo, 30 F.3d at 1359.

"The courts, in the Title VII context, have inappropriately used the terms 'single employer' and 'joint employer' interchangeably, which in fact refer to two distinct concepts... The 'single employer' inquiry... involves the question of whether two allegedly separate business enterprises should in fact be treated as a single entity." (citations omitted). Rivas, 929 F.2d at 820 n. 16.

"The difference between the "joint employer" and the "integrated employer" tests turns on whether the plaintiff seeks to impose liability on her legal employer or another entity... The former looks to whether there are sufficient indicia of an employer/employee relationship to justify imposing liability on the plaintiff's non-legal employer. The latter applies where, as here, liability is sought to be imposed on the legal employer by arguing that another entity is sufficiently related such that its actions... can be attributable to the legal employer." Engelhardt v. S.P. Richards Co., Inc., 472 F.3d 1, 4 n.2 (1st Cir. 2006).

"Whether joint employer status exists is essentially a factual question." Rivera-Vega, 70 F.3d at 163.  "[B]ecause the joint employer issue is simply a factual determination, a slight difference between

two cases might tilt a case toward a finding of a joint employment".
<u>Holyoke</u>, 11 F.3d at 307.

### B. The Facts

It is uncontroverted that plaintiff was hired as an accountant by HH&O which paid her salaries as its employee.[9] HH&O notified plaintiff of her salary increases including granting her a 7% increase on October 10, 2002[10] and established changes in her work schedule.[11] Only HH&O was listed as plaintiff's employer in her discrimination charge filed on October 5, 2005 and in her retaliation charge filed on October 19, 2005 with the PR-DOL. SJBP was not named therein.

Additionally, the following written reprimands as well as incidents plaintiff challenges as harassing or retaliatory were issued by HH&O:

- Plaintiff's warning on April 2, 2002 for having paid the entire dues to the Master Mates & Pilots rather than in trimesters.

---

[9] See Service Contract dated May 3, 2001 establishing her salary and working conditions.

[10] See also, table of Employee Salaries from 2001-2005; Table of Salary Increase Analysis for 2002-2003 and Table of Xmas Bonus Proposal.

[11] See January 8, 2004 memorandum changing working hours for the Accounting Department to commence at 7:00 a.m. until 4:00 p.m. effective February 8, 2004 and February 3, 2005 memorandum changing work schedule commencing at 8:00 a.m. until 5:00 p.m. effective February 28, 2005.

CIVIL NO. 07-1109 (RLA)                                          **Page 41**

-    Letter dated June 18, 2004 regarding deficiency in her
     performance and $100,000.00 frozen assets in Banco Popular
     account.

-    Letter dated September 1, 2004, deducting one-day pay due
     to an alleged unauthorized absence.

-    Three-day suspension letter dated September 30, 2005 due to
     incident with Oceanic.

-    October 28, 2005 letter advising plaintiff of her right to
     inspect her personnel file and admonishing plaintiff for
     leaving work ahead of time.

-    The May 17, 2005 memorandum which provided that pilots were
     to be paid every Friday allegedly handed to plaintiff on
     November 10, 2005.

-    The November 14, 2005 memorandum requiring that all matters
     pertaining to a 40 feet boat be kept together in a separate
     file.

It is uncontested that codefendant SJBP is a duly organized
corporation that groups the harbor pilots who enter the ships to the
San Juan bay. It is the only pilots' association recognized by the
Pilotage Commission for the San Juan Harbor. The individual harbor
pilots are independent contractors who provide their services to
SJBP. The SJBP does not have any employees on its payroll. Payment of
$220.00 to plaintiff which was effected on July 31, for her

CIVIL NO. 07-1109 (RLA)                                        Page 42

accounting services was reported by SJBP to the Puerto Rico Treasury Department for professional services, not as an employee.

Plaintiff argues that the fact that HH&O personnel matters were discussed at the SJBP Board Meetings evinces that these entities were joint employers. However, inasmuch as the same individuals constituted the Board of Directors for both HH&O and SJBP the fact that these discussions were held during the SJBP meetings does not necessarily mean that it was SJBP who was making the decisions. This is particularly so when the corresponding letters - specifically those used by plaintiff as grounds for her discriminatory and retaliatory charges - were all issued by HH&O.

Accordingly, the claims asserted against SJBP in these proceedings are **DISMISSED**.

### VII. TITLE VII - INDIVIDUAL LIABILITY

It is now clearly established that Title VII does not allow for individual liability. *See* Fantini v. Salem State Coll., 557 F.3d 22 (1st Cir. 2009). Accordingly, the Title VII claims asserted against the named defendants individually are hereby **DISMISSED**.

### VIII. SUPPLEMENTAL CLAIMS

Based on the foregoing, all local causes of action based on the claims dismissed herein are likewise **DISMISSED**.

CIVIL NO. 07-1109 (RLA)                                      Page 43

## IX. CONCLUSION

Based on the foregoing, Defendants' Motion Requesting Summary Judgment (docket No. **36**)[12] is **GRANTED IN PART.**

Accordingly, the following discrimination claims asserted both under federal and local statutes are hereby **DISMISSED:**

-    Sexual harassment;

-    Constructive discharge;

-    Changes in work schedule;

-    Salary revisions and fringe benefits;

-    Retaliation.

It is further ORDERED that the  Title VII claims asserted against the individual defendants are hereby **DISMISSED.**

It is further ORDERED that all claims asserted against SJBP are hereby **DISMISSED.**

Judgment shall be entered accordingly.

Only the gender-based difference in the pay scale of her salary claim and the local claims not otherwise dismissed remain pending in this action.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 21st day of December, 2009.

S/Raymond L. Acosta<br>
RAYMOND L. ACOSTA<br>
United States District Judge

---

[12]  See Opposition (docket No. **42**); Reply (docket No. **51**) and Sur-reply (docket No. **56**).